IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHNNY E. BOGAN, | HONORABLE NOEL L. HILLMAN |
| Plaintiff, | CIVIL NO. 04-5617 |
| v. | |
| JO ANNE B. BARNHART, COMMISSIONER OF SOCIAL SECURITY, | **OPINION** |
| Defendant. | |

APPEARANCES:

Philip Wolf, Esq.
228 Kings Highway East
Haddonfield, New Jersey 08033
     Attorney for Plaintiff

Christopher J. Christie
United States Attorney
     By:  Jennifer Rosa
          Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278
     Attorney for Defendant


**HILLMAN**, District Judge:

     This matter comes before the Court pursuant to Section

205(g) of the Social Security Act, as amended, 42 U.S.C. §405(g),

to review the final decision of the Commissioner of the Social

1

Security Administration, denying the application of Plaintiff for Disability Insurance Benefits under Title II of the Social Security Act.  42 U.S.C. § 401, et seq.

For the reasons stated below, this Court will affirm the decision of the Commissioner denying Plaintiff's application for Disability Insurance Benefits.

**I. Background**

A. Procedural History

Plaintiff filed his application for Disability Insurance Benefits ("DIB") on September 3, 2002, with an alleged disability onset date of March 3, 2002.  The Plaintiff alleged severe impairments stemming from several disc herniations, headaches and hypertension.

Plaintiff's application for DIB was denied initially and also upon reconsideration, and a request for a hearing was timely filed.  A hearing was then held before an Administrative Law Judge ("ALJ") on March 16, 2004 in Voorhees, New Jersey.

The ALJ issued a decision denying benefits to Plaintiff on May 24, 2004.  The ALJ held that while Plaintiff's disc herniations, osteoarthritis and hypertension were in fact "severe," the Plaintiff nonetheless retained the requisite residual functional capacity to return to his "past relevant work."  As such, the Plaintiff was found "not disabled" under the

2

Social Security Act and without entitlement to DIB.

Plaintiff filed a request for review of the ALJ's decision to the Appeals Council, and the request was denied on September 10, 2004.  Plaintiff then filed the present action with this Court.

B. <u>Evidence in the Record</u>

1. <u>Plaintiff's Examination By His Attorney</u>

In response to questioning by his attorney, Plaintiff testified that he currently resides at 308 West Powell Street in Melville, New Jersey, and has lived there for eight months.  (R. at 27.)  Before that, Plaintiff testified that he lived at 33 West Chestnut Avenue, also in Melville.  (<u>Id.</u>)  Plaintiff testified that he currently lives with his fiancee, Amy Latimer, his four-year-old daughter, his one-year-old daughter, and his seven-year-old stepdaughter.  (R. at 28.)  Plaintiff testified that his residence is a "two-story," and that it contains steps. (<u>Id.</u>)  Plaintiff claimed that sometimes his left leg "is just completely numb," causing problems when he attempts to walk up and down the steps.  (<u>Id.</u>)

Plaintiff testified that he graduated from high school, and completed a six month "environmental training" program whereby he received an inspector's license for "asbestos inspections, air sampling, water sampling, bulk sampling," and  "building

3

knowledge." (R. at 29.)  The program required that annual "refresher" courses were taken in order to maintain the inspector's license, and Plaintiff testified that he was unable to keep current with that requirement after he stopped working. (R. at 29-30.)  Plaintiff testified that he currently weighs 170 pounds, but that his normal weight is 198.  (R. at 30.) Plaintiff attributed his weight loss to "stress."  (Id.)

Plaintiff testified that his disability began on March 3, 2002, stemming from when he "jumped down off of the top bunk, and...slid on water that was on the ground...and my head and my back slammed on the concrete floor." (R. at 31.)  Plaintiff claims that this slip and fall resulted in injuries to his head, neck and lower back.  (Id.)

Before the accident, Plaintiff testified that he had been working as an environmental technician for various employers. (R. at 31-32.)  Plaintiff testified that his duties for this position consisted of sampling "wells, surface water, soil, sampling soil, also to ship samples to a lab."  (R. at 32.) Plaintiff testified that "throughout the day I maybe sat an hour and half, two hours.  The rest of that time was moving around, preparing samples, setting up equipment."  (Id.)  Plaintiff claimed that the heaviest thing he had to lift at his environmental technician job was a seventy-five pound boat used

4

for surface water sampling.  (R. at 33.)

Plaintiff further testified that he had been a sanitation worker for Pillsbury for two years, from 1999 through 2000. (Id.)  Plaintiff testified that this job was "all standing, moving around," and "the only sitting was maybe at lunchtime." (Id.)  Plaintiff claimed that the heaviest thing he had to lift at this particular job was "maybe 100 pounds."  (Id.)

Plaintiff testified that he worked for '84 Lumbar in 1998 and 1999 as a sales associate.  (R. at 34.)  Plaintiff described his duties as consisting of the delivery of materials for contractors.  (Id.)  Plaintiff testified that this job involved no sitting, and required him to lift objects, like a bag of concrete mix, weighing at least sixty pounds.  (Id.)

Plaintiff testified that he worked for Bally's as a security officer from 1996 through 1998, which involved sitting only at lunchtime, and required him to carry bags of change weighing thirty or forty pounds.  (R. at 35.)  Plaintiff further testified that he worked for Leoni Industries for approximately two years as a "packer."  (R. at 35-36.)  Plaintiff testified that this position involved sitting only at lunchtime, and required him to stack boxes of glass bottles weighing twenty-five or thirty pounds each.  (R. at 36.)

Plaintiff testified that he had not worked since March 3,

5

2002 because he "couldn't take the pain anymore."  (R. at 37.)
Plaintiff claimed that the pain in his neck made it "hard to turn
and look at things at time," and caused him migraines.  (<u>Id.</u>)
Plaintiff testified that the pain in his neck travels down his
left arm into his fingers, and that this occurs "every
day...[s]ince the accident in 2001."  (<u>Id.</u>)  Plaintiff stated
that he is right-handed.  (R. at 38.)  Plaintiff further
testified that his migraines "cause a lot of vomiting."  (<u>Id.</u>)

     Plaintiff testified that he experiences numbness in his
lower back and "incredible pain" in his hips, and that he takes
Oxycontin and Oxycodone to try to relieve the pain.  (R. at 38-
39.)  In response to his attorney's question about whether he
experiences any side effects from the aforementioned medications,
Plaintiff responded "[n]ot really. Well, just – other than my
mind's not right all the time..."  (R. at 39.)  Plaintiff also
testified that he takes Excedrin Migraine, and that it does not
help with the headaches.  (<u>Id.</u>)

     Plaintiff testified that he was presently under the care of
Dr. Arino.  (R. at 40.)  Plaintiff testified that Dr. Arino was
unable to do anything for him besides prescribe medication
because Plaintiff does not have insurance.  (<u>Id.</u>)  If he had
insurance, Plaintiff claimed that he would undergo the surgery
recommended by Dr. Arino for his herniated discs.  (<u>Id.</u>)

Plaintiff testified he can only sit for a maximum of five minutes before experiencing problems in his neck, and after one half hour of sitting he can no longer "cope with things." (R. at 41.) Plaintiff further testified that he could only stand for about one half hour because his "left leg is typically always hurting." (Id.) Plaintiff also testified that he has trouble lifting things more than twenty or twenty-five pounds and walking more than two city blocks. (R. at 41-42.)

Plaintiff testified that he was able to "wash, bathe and get dressed," "sweep the floor" and "take out trash." (R. at 42.) Plaintiff testified that he did not "cook too much," and mostly ate cereal. (R. at 43.) Plaintiff further testified that he had a driver's license and was able to drive, though "the majority of the driving is done by [his] wife." (Id.)

### 2. Plaintiff's Examination By the ALJ

The ALJ questioned Plaintiff about specific exhibits in the record. (R. at 45-47.) The ALJ first pointed to Exhibit 3E, where Plaintiff indicated on a work history report that he had worked as an environmental technician from July 2000 until August 2002. (R. at 45.) The ALJ then noted that Plaintiff claimed his last day of work to be March 3, 2002, and he asked Plaintiff if he had in fact worked until August 2002 as indicated in the report. (Id.) Plaintiff testified that he felt the information

7

on the work history report was "a mistake because on March 3rd of 2002, that's when - that was the last day of work."  (Id.)

The ALJ then pointed to Exhibit 7E, page 3, where Plaintiff indicated on a Social Security Administration background form that he had worked at Sevenson Environmental Services from May 2000 to June 2002.  (Id.)  The ALJ asked Plaintiff if those dates were "also incorrect."  (Id.)  Plaintiff testified that "June of 2002 is actually when I was terminated from my job.  I went on disability that March of 2002."  (Id.)

The ALJ then pointed to Exhibit 11F, a report of an internal medicine examination performed by "Dr. Shaw" in October of 2002. (R. at 46.)  The report referred to Plaintiff as being able to "get [him]self dressed and cook, clean the house, do the laundry, go for food shopping, and manage [his] own money."  (Id.)  It also stated that Plaintiff "takes care of children," and during free time he "socializes with friends, watches TV, listens to the radio and reads books."  (Id.)

In response to the ALJ's question as to whether the report was an accurate statement of his daily activities, Plaintiff testified by saying "I honestly can't say," and "[r]eading has been a problem since my accident, and to tilt my head down and look at a paper longer than 30 seconds, my neck becomes inflared (sic) within those 30 seconds, so it doesn't seem correct to me."

8

(Id.)

### 3. Testimony of Vocational Expert Mitchell Schmidt

Plaintiff's attorney reviewed Vocational Expert Mitchell Schmidt's ("VE") qualifications as a vocational case manager, and stipulated to those qualifications for the purpose of Mr. Schmidt's expert testimony.  (R. at 48.)  The VE reviewed the vocational evidence presented in Plaintiff's case, heard Plaintiff's testimony, and described Plaintiff's prior work experience.  (R. at 48-49.)

The VE testified that during the past fifteen years, Plaintiff had worked as an "environmental technician," a "sanitation technician," a "salesperson," a "security guard," a "hand packager" and a basketball coach.  (R. at 49-50.)  The VE testified that Plaintiff's work as an environmental technician, sanitation technician and salesperson were all "light duty" jobs as described by the Dictionary of Occupational Titles, but "heavy duty" jobs as described by Plaintiff.  (R. at 49.)  The VE also testified that Plaintiff's job as a security guard was described by the Dictionary of Occupational Titles as "light duty," and "medium duty" as described by Plaintiff.  (Id.)  Finally, the VE testified that Plaintiff's job as a hand packager was described by the Dictionary of Occupational Titles as "medium duty" work, and "medium duty" as described by the Plaintiff.  (R. at 49-50.)

9

The ALJ asked the VE to assume for the purposes of a hypothetical question, a thirty-four year old individual with a high school education and the following exertional limitations: the individual 1) can sit for a maximum of one hour at a time; 2) can sit for a total of six hours out of eight in the workday; 3) can stand for a maximum of thirty minutes at a time; 4) can stand for a total of four hours out of eight in the workday; 5) can walk for a maximum of thirty minutes at a time; 6) can walk for a total of two hours out of eight in the workday; 7) can lift twenty pounds on an occasional basis, ten pounds on a frequent basis; 8) can carry twenty pounds on an occasional basis, ten pounds on a frequent basis; 9) requires a sit/stand option in order to perform job duties; and 10) can only occasionally climb stairs or ladders, perform job tasks involving a good sense of balance, bend or stoop.  (R. at 50-51.)

In response to the ALJ's questioning based on the hypothetical, the VE testified that such an individual could perform Plaintiff's past relevant work as an environmental technician, a sanitary technician, a salesperson and a security guard as those jobs have been described by the Dictionary of Occupational Titles.  (R. at 52.)  However, the VE testified that the hypothetical individual could not perform the aforementioned jobs as "actually performed" by Plaintiff.  (Id.)  The VE further

10

testified that the hypothetical individual would be precluded from employment if he or she was required to take "frequent unscheduled breaks during the day" or was not in "regular attendance" at the job. (R. at 52-52A.)

Plaintiff's attorney asked the VE if the ALJ's hypothetical individual would be precluded from Plaintiff's past relevant work if that individual had "occasional difficulty with turning and looking up and down with the head, as well as an additional limitation of an occasional problem with working overhead." (R. at 52A.) In response, the VE testified that such an individual "could probably work the jobs as they described by (sic) the Dictionary of Occupational Titles of environment tech and sanitary tech." (Id.) The VE also testified pursuant to the questions posed by Plaintiff's attorney that the hypothetical individual would not be able to perform those jobs if there was an "occasional inability to maintain attention and concentration." (Id.)

C. Medical Records

Plaintiff was involved in a motor vehicle accident on September 22, 1995. (R. at 162.) Dr. Steven H. Rothfarb dictated a report on September 23, 1995, finding that x-rays of Plaintiff's right ankle, right foot, abdomen, pelvis, cervical spine and skull appeared normal. (R. at 151-55.) In a report

11

dictated April 4, 1996, Dr. Donald P. Underwood described the
results of Plaintiff's lumbar spine MRI as "mild degeneration and
bulge of the L5-S1 disc with mild bilateral inferior neural
foraminal stenosis"[1] and "transitional S1 vertebra."  (R. at
162.)  On June 12, 1996, an x-ray of Plaintiff's left hip
revealed "no fracture or other significant abnormality."  (R. at
171.)  X-rays of Plaintiff's left lower leg and left ankle on
October 21, 1996 appeared normal.  (R. at 172.)

    Plaintiff was examined at South Jersey Hospital in Bridgeton
on February 23, 2001 following a fall.  (R. at 277-83.)  Dr.
Michael A. Villani dictated reports containing normal findings
with regard to Plaintiff's computerized tomography[2] ("CT")
examination of the brain and x-ray of the cervical spine.  (R. at
277-78.)

    In a report dated January 3, 2002, Dr. Vipin K. Gupta
discussed the results of a neurological examination of Plaintiff
on December 17, 2001.  (R. at 299-303.)  Plaintiff's chief
complaints were of neck pain and numbness in both hands, stemming

---

    [1] *Foraminal Stenosis*.  A narrowing of "an orifice or canal"
due to the "aperture or perforation through a bone or membranous
structure."  *Stedman's Medical Dictionary* 699, 1695 (27th
Edition, 2000).

    [2] *Tomography*.  "Making of a radiographic image of a selected
plane by means of reciprocal linear or curved motion of the x-ray
tube and film cassette."  *Id.* at 1842.

from "his injury in March of 2001." (R. at 300.) Dr. Gupta found Plaintiff to be "awake, alert and oriented to time, place and person with intact mentation." (Id.) Dr. Gupta concurred with earlier medical reports showing herniated discs at C5-C6 and L5-S1. (R. at 301.)

In a report dated January 11, 2002, Dr. Gupta discussed the results of his follow-up examination of Plaintiff on January 10, 2002. (R. at 296-98.) Dr. Gupta found the results of both the "nerve conduction" and "H-reflex" studies to be normal. (R. at 296.) Dr. Gupta found Plaintiff's EMG to be normal, with "no definite evidence of lumbosacral radiculopathy[3] or other focal neuropathy[4] on either side." (R. at 297.) Dr. Gupta also noted that Plaintiff had herniated discs at C5-C6 and L5-S1, and that Plaintiff "continues to have chronic neck as well as lower back pains intermittently." (R. at 298.)

In a report dated April 14, 2002, Dr. Ajay K. Munjal discussed his findings based on Plaintiff's recent MRI. (R. at 377-81.) Dr. Munjal noted a "tiny left sided paracentral disc herniation at C3-C4," a "tiny central disc herniation" at C4-C5 and a "small central to left paracentral disc herniation" at C5-

[3] *Radiculopathy.* Disorder of the "nerve roots and nerves." *Id.* at 1503.

[4] *Neuropathy*. "A classical term for any disorder affecting any segment of the nervous system." *Id.* at 1211.

13

C6.  (R. at 377.)

In a report dictated April 22, 2002, Dr. Abdul Qadir discussed the results of consultation with Plaintiff that day. (R. at 306-08.)  Dr. Qadir noted that Plaintiff was currently taking Percocet[5] and Accupril[6].  (R. at 307.)  Dr. Qadir's impression of Plaintiff was lumbar radiculopathy, cervical radiculopathy and "tension type headaches."  (Id.)

In a report dated July 16, 2002, Dr. Martin Kessler reviewed Plaintiff's medical history and the opinions of other examining physicians.  (R. at 312-15.)  Dr. Kessler diagnosed Plaintiff as having "chronic post-traumatic cervical strain/sprain" with a herniated disc at C5-C6 and "chronic post-traumatic unresolved lumbosacral strain/sprain with chronic pain" and a herniated disc at L5-S1.  (R. at 315.)

In a report dated October 4, 2002, Dr. Niranjana Shah found Plaintiff to be "in no acute distress."  (R. at 364.)  Dr. Shah noted that Plaintiff's gait was normal, he could walk on his

---

[5] *Oxycodone Hydrochloride* and *Acetaminophen*.  "Percocet is indicated for the relief of moderate to moderately severe pain." *Physicians' Desk Reference* 1114 (60th ed.2006).

[6] *Quinapril Hydrochloride*. "Accupril is used in the treatment of high blood pressure." http://www.pdrhealth.com/drug_info/rxdrugprofiles/drugs/acc1002.s html (online edition of *Physician's Desk Reference*).

heels and toes without difficulty, and he needed no help changing
for the exam or getting on and off the exam table.  (<u>Id.</u>)  Dr.
Shah further noted that Plaintiff "is able to get himself dressed
and cook, clean the house, does the laundry, goes for food (sic)
shopping, clothes shopping, manages his own money, takes care of
children, and in his free time he socializes with friends,
watches TV, listens to the radio and reads books."  (<u>Id.</u>)  Dr.
Shah diagnosed Plaintiff with hypertension and a history of
chronic neck pain and back pain.  (R. at 366.)

In a report dated October 9, 2002, Dr. Peter F. Arino
discussed the results of his initial consultation with Plaintiff
that day.  (R. at 389-90.)  Dr. Arino's impression was
"acute/chronic low back pain and left lumbar radicular pain
secondary to bulging annulus at L5-S1."  (R. at 390.)  Dr. Arino
recommended that Plaintiff undergo a discography as a "prelude to
probable surgical intervention" for his herniated discs, once
insurance coverage was obtained by Plaintiff.  (<u>Id.</u>)

In a report dated February 10, 2003, Dr. Arino discussed the
results of his re-examination of Plaintiff that day.  (R. at 387-
88.)  Dr. Arino noted that Plaintiff was experiencing "neck pain,
severe headaches, and radiation of the pain down the left upper
extremity to the middle of his left forearm."  (R. at 387.)  Dr.
Arino's impression of Plaintiff's complaints was that he required

15

"treatment in the cervical area with a series of cervical epidural steroid injections." (Id.)  Dr. Arino noted that he would proceed with the injections when Plaintiff obtained insurance coverage.  (R. at 388.)

Dr. Lawrence I. Barr examined Plaintiff on several occasions over an approximately six and a half-year period of time, and reported his findings to Plaintiffs treating physician, Dr. Marshall Pressman.  (R. at 396-411.)  In a report dated October 26, 1995, Dr. Barr found Plaintiff to be "alert, cooperative and oriented."  (R. at 410.)  Dr. Barr attributed Plaintiff's injuries and pain to his recent motor vehicle accident.  (R. at 410-11.)  Dr. Barr found that Plaintiff had suffered "acute traumatic cervical sprain and strain with myofascitis," "acute traumatic thoracic sprain and strain," "acute traumatic lumbosacral sprain and strain with myofascitis"[7] and contusions in the right hip and ribs.  (R. at 411.)

Dr. Barr next examined Plaintiff on September 4, 2001 and discussed the results of Plaintiff's injuries related to his slip and fall accident on February 23, 2001.  (R. at 408-09.)  Dr. Barr diagnosed Plaintiff as having a "posttraumatic cervical

---

[7] *Lumbosacral myofascitis*.  Inflamation in the "sheet of fibrous tissue...surrounding and separating" the muscles in the lower back.  *Stedman's* at 647, 1173.

16

sprain and strain," a "posttraumatic lumbosacral sprain and strain with herniated nucleus pulposus at L5-S1 with lower radicular symptoms," and "posttraumatic cephalgias."[8]  (R. at 409.)

Dr. Barr examined Plaintiff on October 2, 2001 and noted that Plaintiff's recent MRI showed disc herniation at C5-C6.  (R. at 406.)  Dr. Barr examined Plaintiff on November 6, 2001, and again noted his herniated disc and lumbosacral sprain and strain. (R. at 405.)  Dr. Barr recommended that Plaintiff remain under Dr. Pressman's care for "aggressive therapy."  (Id.)  Dr. Barr examined Plaintiff on December 4, 2001 and noted that his cervical spine examination showed his motion to be "80% to 85% of normal in all planes."  (R. at 404.)  In a report dated January 8, 2002, Dr. Barr noted that Plaintiff's "symptoms are starting to improve in regards to the radicular complaints."  (R. at 403.)

In a letter to Plaintiff's attorney dated April 25, 2002, Dr. Barr stated that "[i]t is my opinion, with a reasonable degree of medical probability, that the injuries [Plaintiff] sustained are a direct result of the February 23, 2001...accident and his injuries are permanent in nature" and this opinion "is held within a reasonable degree of medical probability."  (R. at

---

[8] *Cephalalgia*. "Headaches."  *Id*. at 320-21.

17

401.)  In a report dated June 12, 2002, Dr. Barr noted that
Plaintiff's prior bulging disc at L5-S1 from his 1995 motor
vehicle accident was quiescent until his more recent slip and
fall accident.  (R. at 400.)  Dr. Barr further noted in regards
to the bulging disc that "this is a permanent injury and,
unfortunately, some discomfort is permanent."  (Id.)

## II. Discussion

A.   Standard of Review

Under 42 U.S.C. § 405(g), Congress provided for judicial
review of the Commissioner's decision to deny a complainant's
application for Disability Insurance Benefits.  Ventura v.
Shalala, 55 F.3d 900, 901 (3d Cir. 1995).  A reviewing court must
uphold the Commissioner's factual decisions where they are
supported by "substantial evidence."  42 U.S.C. §§ 405(g),
1383(c)(3); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir.
2001); Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000); Williams
v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).  Substantial
evidence means more than "a mere scintilla."  Richardson v.
Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co.
V. NLRB, 305 U.S. 197, 229 (1938)).  It means "such relevant
evidence as a reasonable mind might accept as adequate to support
a conclusion."  Id.  The inquiry is not whether the reviewing
court would have made the same determination, but whether the

Commissioner's conclusion was reasonable.  See Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

A reviewing court has a duty to review the evidence in its totality.  See Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984). "[A] court must 'take into account whatever in the record fairly detracts from its weight.'" Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (quoting Willbanks v. Secretary of Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988) (quoting Universal Camera Corp. V. NLRB, 340 U.S. 474, 488 (1951)).

The Commissioner "must adequately explain in the record his reasons for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F. Supp 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)).  The Third Circuit has held that an "ALJ must review all pertinent medical evidence and explain his conciliations and rejections." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000).  Similarly, an ALJ must also consider and weigh all of the non-medical evidence before him.  Id. (citing Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)); Cotter v. Harris, 642 F.2d 700, 707 (3d Cir. 1981).

The Third Circuit has held that access to the Commissioner's reasoning is indeed essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all

19

> evidence and has sufficiently explained the
> weight he has given to obviously probative
> exhibits, to say that his decision is
> supported by substantial evidence approaches
> an abdication of the court's duty to
> scrutinize the record as a whole to determine
> whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978).  Although an

ALJ, as the fact finder, must consider and evaluate the medical

evidence presented, Fargnoli, 247 F.3d at 42, "[t]here is no

requirement that the ALJ discuss in its opinion every tidbit of

evidence included in the record," Hur v. Barnhart, 94 Fed. Appx.

130, 133 (3d Cir. 2004).  In terms of judicial review, a district

court is not "empowered to weigh the evidence or substitute its

conclusions for those of the fact-finder."  Williams, 970 F.2d at

1182.

Apart from the substantial evidence inquiry, a reviewing

court is entitled to satisfy itself that the Commissioner arrived

at his decision by application of the proper legal standards.

Sykes, 228 F.3d at 262; Friedberg v. Schweiker, 721 F.2d 445, 447

(3d Cir. 1983); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J.

1981).

B.   Standard for Disability Insurance Benefits

The Social Security Act defines "disability" for purposes of

an entitlement to a period of disability and disability insurance

benefits as the inability to engage in any substantial gainful

20

activity by reason of any medically determinable physical and/or
mental impairment which can be expected to result in death, or
which has lasted or can be expected to last for a continuous
period of not less than 12 months.  See 42 U.S.C. §
1382(a)(3)(A).  Under this definition, a claimant qualifies as
disabled only if his physical or mental impairments are of such
severity that he is not only unable to perform his past relevant
work, but cannot, given his age, education, and work experience,
engage in any other type of substantial gainful work which exists
in the national economy, regardless of whether such work exists
in the immediate area in which he lives, or whether a specific
job vacancy exists for him, or whether he would be hired if he
applied for work.  42 U.S.C. § 1382c(a)(3)(B)(emphasis added).

The Commissioner has promulgated regulations for determining
disability that require application of a five-step sequential
analysis.  See 20 C.F.R. § 404.1520.  This five-step process is
summarized as follows:

1.   If the claimant currently is engaged in substantial
     gainful employment, he will be found "not disabled."

2.   If the claimant does not suffer from a "severe
     impairment," he will be found "not disabled."

3.   If the severe impairment meets or equals a listed
     impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1
     and has lasted or is expected to last for a continuous
     period of at least twelve months, the claimant will be
     found "disabled."

4.   If the claimant can still perform work he has done in
     the past ("past relevant work") despite the severe
     impairment, he will be found "not disabled."

5.   Finally, the Commissioner will consider the claimant's
     ability to perform work ("residual functional
     capacity"), age, education, and past work experience to
     determine whether or not he is capable of performing
     other work which exists in the national economy.  If he
     is incapable, he will be found "disabled."  If he is
     capable, he will be found "not disabled."

20 C.F.R. § 404.1520(b)-(g).  Entitlement to benefits is

therefore dependent upon a finding that the claimant is incapable

of performing work in the national economy.

     This five-step process involves a shifting burden of proof.

See Wallace v. Secretary of Health & Human Servs., 722 F.2d 1150,

1153 (3d Cir. 1983).  In the first four steps of the analysis,

the burden is on the claimant to prove every element of his claim

by a preponderance of the evidence.  See Id.  In the final step,

the Commissioner bears the burden of proving that work is

available for the plaintiff: "Once a claimant has proved that he

is unable to perform his former job, the burden shifts to the

Commissioner to prove that there is some other kind of

substantial gainful employment he is able to perform."  Kangas v.

Bowen, 823 F.2d 775, 777 (3d Cir. 1987); see Olsen v. Schweiker,

703 F.2d 751, 753 (3d Cir. 1983).

     Here, the ALJ found that Plaintiff had not been under a

disability as defined in the Social Security Act at any time
since his alleged onset date of disability, i.e., March 3, 2002,
through the date of the decision.  At step one, the ALJ found
that Plaintiff had not engaged in substantial gainful employment
since the alleged onset of his disability.  At step two, the ALJ
found that Plaintiff's herniated lumbar disc, herniated cervical
disc, osteoarthritis and hypertension were "severe" according to
the requirements in the Regulations.  At step three, however, the
ALJ determined that the aforementioned medically determinable
impairments did not meet or equal one of the listed impairments
in Appendix 1, Subpart P, Regulation No. 4.  Finally, at step
four the ALJ found that the Plaintiff had not carried his burden
of showing that he was unable to perform any of his past relevant
work.  Incorporating the testimony of a vocational expert ("VE"),
the ALJ found that Plaintiff possessed the residual functional
capacity to perform his past relevant work as an environmental
technician, a sanitation technician, a salesperson and some
security guard positions.  As a result, the ALJ found that
Plaintiff was not entitled to Disability Insurance Benefits.

    C.  <u>Plaintiff's Arguments</u>

    Plaintiff's brief makes four arguments as to why the ALJ's
finding that the Plaintiff is not eligible for disability
benefits is incorrect.  First, Plaintiff argues that the ALJ's

credibility determination with regard to Plaintiff's subjective complaints of pain is not supported by substantial evidence. Second, Plaintiff argues that the ALJ erred at step two of the sequential analysis in not finding that Plaintiff's headaches were a "severe" impairment.  Third, Plaintiff argues that the ALJ erred at step four because the determination of Plaintiff's residual functional capacity is not based on substantial evidence.  Lastly, Plaintiff argues that the ALJ erred in dismissing two specific reports from Plaintiff's treating physicians.

For the following reasons, this Court will affirm the ALJ's denial of disability insurance benefits to Plaintiff.

### 1.   <u>Whether the ALJ failed to fully credit Plaintiff's subjective complaints of pain</u>

Plaintiff argues that the ALJ's "finding that Plaintiff's allegations concerning the severity of his pain are not fully credible is not supported by substantial evidence."  Pl. Br. at 7.

While the ALJ is required to give serious consideration to a claimant's subjective complaints of pain, <u>Welch v. Heckler</u>, 808 F.2d 264, 270 (3d Cir. 1986), he is not bound to accept unquestioningly the credibility of such subjective evidence. <u>Marcus v. Califano</u>, 615 F.2d 23, 27 (2d Cir. 1979).  "In all

cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations." Schaudeck v. Commissioner of Social Security Administration, 181 F.3d 429, 433 (3d Cir. 1999)(quoting SSR 95-5p).  This Court will only reverse an ALJ's findings with regard to subjective complaints of pain if those findings are not supported by "substantial evidence." Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983).

Here, the ALJ stated in his decision that Plaintiff "has a number of subjective complaints, which are not supported by the medical evidence of record."  (R. at 17.)  The ALJ supported this assertion by providing several contraindications found in the medical opinions of record.  (See, e.g., R. at 17-18 ("[A]lthough he complains of symptoms of pain in his back and neck, comprehensive examinations have revealed the claimant's cervical spine showed full flexion, extension, lateral flexion, and full rotary movement bilaterally." "Sitting root and straight leg raising maneuvers failed to reveal pain in the back or extremities.").)  Also, because Plaintiff appeared before and was questioned by the ALJ, as opposed to this Court, the ALJ is

25

better able to make credibility determinations.  Furthermore, the ALJ did not assert that Plaintiff experiences *no* pain: rather, the ALJ determined that Plaintiff's "subjective complaints of pain and discomfort and resulting limitations are not credible to the extent alleged."  (R. at 18.)

Therefore, the ALJ's finding that Plaintiff's subjective complaints of pain are not fully credible is supported by substantial evidence.

### 2.  <u>Whether the ALJ erred at step two of the sequential analysis in not finding that Plaintiff's headaches were a "severe" impairment</u>

Plaintiff argues that the ALJ "completely ignored Plaintiff's complaints of debilitating headaches" and failed to explain why Plaintiff's "impairments related to headaches are not severe."

The Regulations state that an impairment is "severe" when it "significantly limits your physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  Thus, at step two of the sequential analysis the burden is on the individual claimant to supply substantial medical evidence indicating that the alleged impairment significantly limits his or her ability to work.

Here, the ALJ found at step two of the sequential analysis

26

that only Plaintiff's herniated lumbar disc, herniated cervical disc, osteoarthritis and hypertension were "severe" impairments. (R. at 16, 19.)  The ALJ did not find Plaintiff's headaches to be a "severe" impairment.  There is no evidence in the record that Plaintiff's headaches limited his ability to work at all, let alone to the degree required by the Regulations in order to substantiate a determination that the impairment is "severe." While Plaintiff's testimony and two medical reports from Dr. Barr demonstrate the existence of headaches (R. at 38, 387, 409), existence alone is insufficient to establish severity.

Therefore, the ALJ's determination that Plaintiff's headaches are not "severe" at step two of the sequential analysis is supported by substantial evidence.

   3.   **Whether or not the ALJ's determination at step four of the sequential analysis, including the calculation of Plaintiff's RFC, was based on substantial evidence**

Plaintiff argues that "the ALJ's finding that the Plaintiff retained the residual functional capacity to perform his past relevant work is not supported by substantial evidence."  Pl. Br. at 5.

At step four of the sequential analysis, the ALJ found that Plaintiff retained the following residual functional capacity:

[I]n a typical 8 hours workday, the claimant is capable

of sitting for up to 6 hours in a typical 8 hour
workday with one hour intervals; standing for up to 4
hours with 30 minute intervals; walking for up to 2
hours with 30 minute intervals; lifting and carrying
weights up to 10 pounds, frequently and up to twenty
pounds occasionally; and occasionally climbing stairs,
balancing, bending and stooping.

(R. at 17.)  Based on this assessment and the testimony of a
vocational expert, the ALJ determined that Plaintiff's "past
relevant work as environmental technician; sanitation technician;
building supply job and some security jobs did not require the
performance of work-related activities precluded by his residual
functional capacity."  (R. at 19.)

RFC is an assessment of "an individual's ability to do
sustained work-related physical and mental activities in a work
setting on a regular and continuing basis," one that "only
considers functional limitations and restrictions that result
from an individual's medically determinable impairment or
combination of impairments."  (SSR 96-8p, 1.)  The RFC is
expressed in terms of "exertional levels" of work, such as
sedentary, medium, and heavy.  (Id.)  "Medical impairments and
symptoms, including pain, are not intrinsically exertional or
nonexertional.  It is the functional limitations or restrictions
caused by medical impairments and their related symptoms that are
categorized as exertional or nonexertional."  (Id.)

As noted by the ALJ in his decision, the Dictionary of

28

Occupational Titles characterizes Plaintiff's prior work as an
environment specialist, sanitation technician, salesperson
(building supply) and security guard as light in exertional
demands.  Light duty exertional level work is defined in the
Regulations as follows:

> Light work involves lifting no more than 20 pounds
> at a time with frequent lifting or carrying of
> objects weighing up to 10 pounds. Even though the
> weight lifted may be very little, a job is in this
> category when it requires a good deal of walking
> or standing, or when it involves sitting most of
> the time with some pushing and pulling of arm or
> leg controls.  To be considered capable of
> performing a full or wide range of light work, you
> must have the ability to do substantially all of
> these activities.

20 C.F.R. § 404.1567(b).

Here, both the ALJ's RFC calculation and determination
that Plaintiff was not precluded from his past relevant work
are supported by substantial evidence.  As succinctly noted
by the Commissioner in her brief, "plaintiff's medical
record reveals someone with full motor strength, no weakness
in his muscles, no sensory deficits, and no problems with
reflexes."  Df. Br. at 16.  The record supports this
assertion by the Commissioner, and is indicative of
substantial evidence for the ALJ's step four determination.

For example, Dr. Villani reported a normal CT exam of
Plaintiff's brain (R. at 277-78), Dr. Gupta found "nerve

29

conduction" and "H-reflex" studies to be normal (R. at 296),
as well as Plaintiff's EMG to be normal with "no definite
evidence of lumbosacral radiculopathy or other focal
neuropathy on either side." (R. at 297, 364.)  Also, Dr.
Shah noted that Plaintiff's gait was normal, he could walk
on his heels and toes without difficulty, he needed no help
changing for the exam or getting on and off the exam table,
he was able to get himself dressed and cook, clean the
house, do the laundry, go food shopping, clothes shopping,
manage his own money, take care of children, socialize with
friends, watch TV, listen to the radio and read books." (R.
at 364.)  Furthermore, Dr. Barr examined Plaintiff on
December 4, 2001 and noted that his cervical spine
examination showed his motion to be "80% to 85% of normal in
all planes." (R. at 404.)

     This is not to say that Plaintiff could return to his
prior employment as he actually performed it, because it
appears from the record that he could not.  The VE
classified Plaintiff's descriptions of how he performed his
previous work as either heavy duty or medium duty positions.
(R. at 49-50.)  The ALJ found, however, that Plaintiff was
capable of light duty exertional level work, and the
majority of Plaintiff's past relevant work is described by

30

the Dictionary of Occupational Titles as light duty as
generally performed in the national economy, rather than as
Plaintiff had performed it.  (<u>Id.</u>)

The standard for step four of the sequential analysis
is to determine whether Plaintiff's impairments prevent him
from returning to his past relevant work.  20 C.F.R. §
404.1520(f).  At this step, evidence of how Plaintiff
actually performed his past relevant work and how that work
is generally performed in the national economy are both
determinative.  20 C.F.R. § 1560(b)(2).  As such, although
Plaintiff could not return to his past relevant work as he
actually performed it, the ALJ correctly found that
Plaintiff was not disabled because he could return to his
past relevant work as generally performed in the national
economy.

Therefore, the ALJ's findings at step four of the
sequential analysis are supported by substantial evidence.

### 4.   <u>Whether the ALJ erred in dismissing two specific<br>reports from Plaintiff's treating physicians</u>

Plaintiff argues that the ALJ erred in failing to
"distinguish the records of plaintiff's pain management
physician, Dr. Arino" and by omitting "from [his] decision, Dr.
Barr's September 16, 2003 report."  Pl. Br. at 9.

31

An ALJ, as the fact finder, must consider and evaluate the medical evidence presented.  Fargnoli, 247 F.3d at 42.  However, "[t]here is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."  Hur, 94 Fed. Appx. at 133.  Most importantly, the record must be sufficiently developed so that this Court can provide meaningful judicial review.  That review consists of determining whether the ALJ based his findings on substantial evidence, 42 U.S.C. §§ 405(g), 1383(c)(3), and whether he arrived at his decision by application of the proper legal standards.  Sykes, 228 F.3d at 262; Friedberg, 721 F.2d at 447.

Here, the ALJ based his findings on substantial evidence and applied the proper legal standards.  Plaintiff argues that the ALJ failed to distinguish the reports of Dr. Arino in his decision, but this argument is flawed in two ways.  First, the Regulations do not require an ALJ to discuss and distinguish every medical opinion from the same doctor.  Second, even though the ALJ did not specifically distinguish Dr. Arino's reports in his decision, the ALJ did specifically discuss Dr. Arino's report regarding Plaintiff's treatment with pain medication.  (R. at 17.)  The remainder of Dr. Arino's reports concern his reluctance to treat Plaintiff simply with pain medication instead of correcting the underlying condition.  (R. at 389-90.)  Because

32

the reports that are not specifically referenced in the ALJ's decision do not support Plaintiff's claimed disability, the ALJ's failure to specifically reference that information is not erroneous.

Plaintiff's argument that the ALJ erred in omitting from his decision Dr. Barr's September 16, 2003 report is equally without merit. In reference to that report, even though the ALJ did not discuss its specific details in his decision, those details do not alter the fact that substantial evidence supports the ALJ's findings. If anything, this particular report from Dr. Barr *supports* the ALJ's explicit findings: specifically, that Plaintiff had severe impairments from disc herniations at C5-C6 and L5-S1, and that Plaintiff had the ability to physically perform basic work functions. (R. at 400.)("The sacrosciatic notches were nontender bilaterally. Sacroiliac joints were nontender. Range of motion of the lumbosacral spine was...75% normal...Motor strength was +5/5...no sensory deficit to light touch in either lower extremity.")

Based on this Court's thorough review of the administrative record and analysis of the ALJ's decision, it is clear that the ALJ rooted his findings in substantial evidence. Therefore, the ALJ did not err in regards to his treatment of the medical evidence.

33

**III.   <u>CONCLUSION</u>**

       For the reasons stated above, the Commissioner's finding that Plaintiff is "not disabled" shall be affirmed.  An accompanying Order will be entered.


DATE: <u>May 22, 2007</u>       <u>**s/ Noel L. Hillman**</u>
      At Camden, New Jersey    NOEL L. HILLMAN
                             United States District Judge

34